**Charles D. CRONEN, Relator,**

v.

**The Honorable Bradley SMITH, Visiting Judge of the 151st District Court of Harris County, Respondent.**

No. 01–90–00757–CV.

Court of Appeals of Texas, Houston (1st Dist.).

June 14, 1991.

Charles Cronen, pro se.

Mike Driscoll, County Atty., Joan Denton, Asst. County Atty., Houston, for respondent.

Before SAM BASS, DUNN and MIRABAL, JJ.

## OPINION

DUNN, Justice.

Relator, attempting to appeal an adverse judgment in his suit against the city of Pasadena for an allegedly illegal speed trap, seeks relief by way of mandamus from respondent's order sustaining the district clerk's contest to relator's affidavit of inability to pay costs on appeal. Tex. R.App.P. 40(a)(3). We overrule relator's motion for leave to file.

 We first note that the verification attached to relator's handwritten petition for writ of mandamus is signed only by a notary public and not by relator himself. Therefore, relator has failed to properly verify the truth of all factual allegations contained in the petition and to furnish properly certified or sworn copies of the exhibits attached to the motion. Tex. R.App.P. 121(2)(F), (4). On this basis, motion for leave to file should be overruled.

However, since relator may correct these technical deficiencies and refile the motion and petition, we will address the merits of his petition in the interest of judicial economy.[1]

Relator alleges that he met his burden of proof at the hearing on his pauper's oath and, therefore, respondent had a clear duty to grant his application for a free statement of facts. Consequently, relator claims respondent abused his discretion in denying relator a free statement of facts. The question before us is whether the record as a whole establishes that the trial judge abused his discretion in sustaining the contest. *Keller v. Walker*, 652 S.W.2d 542, 543 (Tex.App.—Dallas 1983, orig. proceeding).

Because a statement of facts from the hearing on the pauper's oath application was necessary to this Court's review, we ordered the official court reporter who reported the hearing to file the statement of facts from the hearing at no cost to relator. We have now reviewed the record of the hearing on relator's pauper's oath and find no abuse of discretion in the trial court's decision.

 Relator had the burden to prove the allegations of his affidavit. Tex. R.App.P. 40(a)(3)(D). When the contest is sustained and mandamus is sought to review that ruling, the question is whether an examination of the record as a whole establishes that the trial judge abused his discretion. *Keller*, 652 S.W.2d at 543. In ruling on the merits of the affidavit at the trial court level, the test for determining entitlement to proceed in forma pauperis is whether the preponderance of the evidence shows that the appellant would be unable to pay the costs, or a part thereof, or give security therefor, if he really wanted to and made a good faith effort to do so. *Allred v. Lowry*, 597 S.W.2d 353, 355 (Tex. 1980); *Pinchback v. Hockless*, 139 Tex.

1. Without contending that notice was not given, the district clerk also points out that relator's petition does not contain proof of the required notice to the clerk and the court reporter of the filing of his affidavit. Tex.R.App.P. 41. If relator fails to give the required notice, he shall not be intitled to prosecute the appeal without giving costs or security therefor. Tex.R.App.P. 41(b). At the hearing on his pauper's oath, relator stated that the notice was given in compliance with the rule. Since this issue is not essential to our disposition of the mandamus, we do not decide it.

536, 164 S.W.2d 19, 20 (1942); *Keller*, 652 S.W.2d at 543.

■ At the May 21, 1990 hearing, the trial court heard considerable evidence of relator's financial condition including the following: In January 1990, relator nearly amputated his finger while on the job and had been unable to work since that time; he was receiving worker's compensation benefits of $238 a week; he had received food stamps in the past but was no longer on welfare of any kind; while at his job prior to his injury he had earned $403.36; and at some point in time he had also received eight weeks of unemployment benefits at $54 a week. Relator's own evidence showed that, at the time of the hearing, his income could total approximately $989 per month from worker's compensation.

Relator also stated that he had expected his doctor to release him for light duty work that same day, but he had missed the appointment because of the hearing; he was to see the doctor and expected the release later that same week or the next; he had been working for the last fifteen years but not every day; and his income for 1989 was $5,728. Relator claimed that he also has problems looking for work and working regularly because he has to go to court all the time. Relator also testified that he can no longer afford to drive his car; he lives in a shack without utilities; and he has no refrigerator. He pays $55 per month to maintain his furniture in storage. At the time of the hearing, he had a savings account balance of $5.01. Relator testified that he had been prevented from working regularly because he has been doing "court work" on the many court cases that he filed.

Cross-examination and argument by counsel for the contestant focused on relator's immediate expectation of being released for work and his excuse that his court cases prevent him from obtaining and keeping employment. Thus, the contestant put into issue whether relator could have paid the costs of appeal or a part thereof, *if he really wanted to and made a good faith effort to do so.*

The trial court found that relator's unemployment was not involuntary. The court also found that relator's filing of numerous lawsuits against various governmental entities in Harris County was by his own choice and was, therefore, an inadequate excuse for his not working. The court sustained the contest to relator's affidavit.

■ Mandamus is an extraordinary remedy which will issue to compel a nondiscretionary act, *Smith v. Rankin*, 661 S.W.2d 152, 153 (Tex.App.—Houston [1st Dist.] 1983, orig. proceeding), or to correct a clear abuse of discretion or the violation of a duty imposed by law when there is no adequate remedy by appeal. *Johnson v. Fourth Court of Appeals*, 700 S.W.2d 916, 917 (Tex.1985). A trial court abuses its discretion when it reaches a decision so arbitrary and unreasonable as to amount to a clear and prejudicial error of law. *Id.* To show a clear abuse of discretion, the relator must show that, under the circumstances of the case, the facts and law permit the trial court to make *but one decision. Id.; Rowe v. Moore*, 756 S.W.2d 117, 119 (Tex.App.—Houston [1st Dist] 1988, orig. proceeding) (emphasis added). In *Downer v. Aquamarine Operators, Inc.*, the supreme court stated,

"[t]he test for abuse of discretion is not whether, in the opinion of the reviewing court, the facts present an appropriate case for the trial court's action. Rather, it is a question of whether the [trial] court acted without reference to any guiding rules and principles ... whether the act was arbitrary and unreasonable."

*Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex.1985).

The dissent relies on *Ranier v. Brown*, 623 S.W.2d 682 (Tex.Civ.App.—Houston [1st Dist.] 1981, orig. proceeding), in concluding that the trial court abused its discretion. However, we believe *Ranier* can be distinguished and harmonized with this case. In *Ranier*, a husband and wife both sought to appeal an order terminating their parental rights. Both husband and wife filed affidavits of indigency. Timely contests were also filed. The trial court held a hearing and sustained the contest to each

affidavit. However, because the trial court failed to timely enter its orders sustaining the contests to the affidavits, this Court held that all allegations in the affidavits were to be taken as true. Tex.R.App.P. 356 (Vernon 1967), now Tex.R.App.P. 40(a)(3). The Court then reviewed the evidence from the hearing to determine whether the trial court had abused its discretion in sustaining the contests.[2]

The Court first concluded that both the husband and wife were undeniably impoverished. *Ranier*, 623 S.W.2d at 686. Neither had any money or property; both had lost their jobs; they lived with Ronald Ranier's mother and used her car for transportation; there was no reasonable expectation that either could borrow money for appellate costs.

Finding the evidence insufficient to show that Alice Ranier could have paid the cost of the appeal, or any part thereof, the Court concluded that the trial judge abused his discretion in sustaining the contest to Alice Ranier's affidavit. However, the Court also noted that Ronald Ranier had obtained a job just two weeks prior to the hearing and had been working at that time for approximately two weeks. His expected income from that job was less than $800 per month. He had not, at the time of the hearing, received any wages. Nor had he ever held any job for longer than one month. Nevertheless, because the evidence showed that he could save the $500 necessary for his cost bond, the Court concluded that the trial judge did not abuse his discretion in sustaining the contest to Ronald Ranier's affidavit. *Ranier*, 623 S.W.2d at 686.

In the instant case, all statutory deadlines were timely met, and no presumption was operating in favor of the allegations in the affidavit. The record in the instant case showed that relator, like Mr. Ranier, had an expected income of approximately $989 per month at the time of the hearing.

There was also conflicting evidence regarding his willingness to get a job and thereby make a good faith effort to pay the costs of the appeal or some part thereof. Based upon the conflicting evidence presented in the record as a whole, we cannot say that the trial court's decision to sustain the contest to relator's affidavit was made arbitrarily and without regard for any guiding rule or principle.

Accordingly, relator's motion for leave to file a petition for writ of mandamus is overruled.

MIRABAL, Justice, dissenting.

I respectfully dissent.

First, I disagree with the majority's conclusion that the verification attached to relator's petition for writ of mandamus is defective. On the page containing the verification appears both relator's signature and the notary public's signature. The fact that the relator signed above the verification statement, instead of below it, is not a fatal defect, in my opinion.

As to the evidence presented at the May 21, 1990 hearing on relator's pauper's affidavit, Judge J. Bradley Smith presiding, I find it is clear and uncontested that relator was unable to pay the costs, or a part thereof, or give security therefor, assuming "he really wanted to and made a good faith effort to do so." *Pinchback v. Hockless*, 139 Tex. 536, 537, 164 S.W.2d 19, 20 (1942).

The following are excerpts from relator's uncontroverted testimony:

[By relator]: Here's a letter from the doctor about my finger. It's on the letterhead of the Texas Institute of Plastic Surgery from Dr. Franklin A. Rose.

Well, it says: To whom it may concern Re: Charles Cronen, Patient No. 1520096. Mr. Cronen has been released from work since January 24, 1990, when he presented to our office with a near-

---

**2.** We note here that the proper test in *mandamus* is whether the trial court abused his discretion in sustaining the contest to the affidavit. However, based upon the wording in the opinion, the *Ranier* court appears to have applied a sufficiency of the evidence test in reviewing the trial court's order as does the dissent in our case. Sufficiency of the evidence is the proper standard of review on *appeal*, not on mandamus. However, because we distinguish the case on other grounds, we do not address this issue further.

complete amputation of the mid-distal phalanx of the right middle finger.

....

Okay. With open compound fracture and injury to the nail and germinal nail matrix as well as disruption of tendon insertion of the extensor mechanism dorsally.

If I can be of any help to you, please do not hesitate to contact me. Very truly yours, Franklin A. Rose, M.D.

What that means is the forklift like cut my finger off. It broke the bone and it was hanging there just by a little piece of meat and was flapping around, you know. And it's still not completely well yet. Anyway, that's kept me from working since January. But he says he might—he's planning on sending me back for light duty or something as of this week. But I haven't been over there because I had to—

THE COURT: Go to court.

[Relator]: —go to court this morning, yes, sir.

....

[By Relator]: Besides not having any money, that's what I tried to cover through all that, I've been on welfare and I didn't have any money and I ain't got any property to pay with. I don't have any real property outside of my homestead, which is just this one lot where I live on and my little shack. I'm living in poverty. I don't have no utilities. I don't have any conveniences, you know, no electric, no water, no sewer, no regular—you know, it's just complete poverty over there.

....

And beyond that, due to my finger being broke, I haven't had any work all year so I didn't have any money to live on. Up until the time I was getting my compensation, I was in pretty bad shape, you know. And that money has to go for a lot of bills and stuff.

....

[By Defense Counsel]: Q. All right. How much was the workmen's compensation that you got every month?

[By Relator]: A. $238 a week.

Q. And what other money have you been getting?

A. None.

Q. What have you been living on before you got the workmen's compensation.

A. I told you I was behind on my bills. I scraped along on what I made, which is almost nothing.

Q. No, no, just—you were getting food stamps?

A. Yes. ma'am.

Q. And you were on welfare?

A. Yes. ma'am.

Q. Had you tried to get a job?

A. Yes. ma'am.

Q. How did you get the job at the Astrodomain?

....

Q. Have you tried getting a job anywhere else?

A. Yes, ma'am.

Q. Where?

A. I tried getting all kinds of easy jobs, like sales clerk, telephone work, paper office trainee, filing clerk, all kind of little easy jobs that I could do with one hand, you know.

Q. Have you tried working at any of the restaurants or fast food places—

A. No, ma'am.

Q. —some of those people that are always asking for help?

A. I didn't apply at any restaurants, no, ma'am.

Q. Because they're usually asking for help.

A. I can't stand kitchen work.

....

Q. Just let me ask you a question. Do you have any property you could get a loan on?

A. No, ma'am. I've tried to get loans in the past. I've even offered to put up my shack and my lot and they wouldn't take it for collateral. I can't get home improvement loans, home construction loans, court loans, bond loans, or any kind of loans. And I've tried and tried and tried.

Q. May I ask, who have you tried to borrow from?

A. Almost every major bank in Houston. All these banks downtown, Texas Commerce Bank. First City Bank, Republic Bank, MBank, Bank of the Southwest. Every major bank you can find. All the savings and loans in my neighborhood. All the finance companies I could find between my house and Almeda Mall, which is three or four miles, within that area around there, every financial institution that I could find.

Q. Did you file an income tax last year?.

A. Yes, ma'am. Let me see what it was here. Last year, I made $4,182, plus some unemployment of $1,546, for a total income last year of $5,728, which left me on welfare.

Q. Do you know what the costs of appeal would be in this case?

A. No, ma'am, but I was trying to say—in the past, Mr. Hardy has asked me for a thousand dollars standard bond. They charge me fifty cents or a dollar a page for every page they do for this, that and the other. They charge me separately for the statement of facts on top of the record and everything else. And I just didn't have the money, because I didn't have the money to get by and live on. And now I've got all these other problems come up that I don't have the money to cover them.

Relator further testified he no longer drives his car because he does not have the money to repair it or to buy gas, nor can he pay the inspection or license plate fees. He has no refrigerator, since his shack has no electricity or running water. He did not start receiving workers' compensation benefits until May 1, 1990, three weeks before the hearing.

After hearing the evidence and closing arguments, Judge Smith stated the following:

THE COURT: Okay. Mr. Cronen, I remain unconvinced that you are involuntarily unemployed.

. . . .

Nobody had held a gun to your head to make you come up here and file all these lawsuits against various governmental entities in this county. You've done that by your own choice. So your inability to work because you have to go to court doesn't hold any water with me, because you're here by your own choice.

And secondly, you have indicated also here that you are somewhat selective about what kind of work you do. You said you don't like restaurant work. Well, I'm not going to force the taxpayers of Harris County to pay for your appeal when you come up here and say that you don't like to do restaurant work. If you want to appeal this case, you go get you a job somewhere, in a restaurant if necessary, and pay the costs like every other litigant in this county.

The contest is sustained. That's all.

There is no doubt from the evidence that relator is impoverished. Whether his poverty resulted from his own lack of effort cannot be considered in determining whether he is able to pay the costs of appeal. *Ranier v. Brown*, 623 S.W.2d 682, 686 (Tex.Civ.App.—Houston [1st Dist.] 1981, orig. proceeding). A person should not be denied the right to an appeal even though his inability to pay the costs results from his past misconduct or improvidence. *Id.*

In *Ranier*, this court granted mandamus as to the wife relator, finding the trial court abused its discretion in sustaining the contest to her affidavit of inability to pay costs. However, as to the husband relator, we denied mandamus because he had secured a job two weeks before the hearing, and he had 1–½ months left to save enough money to pay the $500 cash deposit for his appeal; the appeal bond was not due until 1–½ months *after* the hearing.

In the present case, relator wishes to appeal from a judgment signed February 1, 1990. The deadline for filing his appeal bond, or affidavit in lieu thereof, was May 2, 1990. The hearing on the contest to relator's affidavit of inability to pay was conducted on May 21, 1990. Unlike the husband relator in *Ranier*, relator here had no additional time after the hearing to save

money for the posting of an appeal bond; therefore, the trial court here was restricted to a consideration of relator's *then,* at the moment of the hearing, ability to pay a cash deposit of $1000.00, and other costs of appeal.[1]

Rule 145 of the Texas Rules of Civil Procedure defines a "party who is unable to afford costs" as a "person who is presently receiving a government entitlement based on indigency or any other person who has no ability to pay costs." Up until three weeks before the hearing in this case, relator had been on welfare and had been receiving food stamps; before May 1, 1991, he was a "party who is unable to afford costs" as a matter of law. Relator's welfare and food stamp benefits ceased when he began receiving workers' compensation benefits for his injured hand; the worker's compensation benefits constituted his sole income at the time of the hearing.

In my opinion, as of the date of the hearing, relator was not yet in a position of enjoying what most people consider the bare necessities of life. I cannot condone a conclusion that the $238.00 per week relator began receiving May 1, 1991, three weeks before the hearing, should be applied to a $1000.00 appeal bond due immediately.

In my opinion, the trial court abused its discretion in sustaining the contest to relator's affidavit of inability to pay costs of appeal. I would grant leave to file the petition for writ of mandamus.

---

**1.** It is also noted that the majority opinion, in distinguishing *Ranier,* does not seem to take into account the purchasing power of the dollar in 1981, as compared to the purchasing power of the dollar in 1991, i.e., the effect of inflation.